# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

MARIA TORRES CRUZ,                          :
        Plaintiff,                          :
                                  :
          v.                          :        C.A. No. 11-638M
                                  :
MICHAEL J. ASTRUE,                          :
COMMISSIONER OF SOCIAL SECURITY,            :
        Defendant.                          :

## REPORT AND RECOMMENDATION

Patricia A. Sullivan, United States Magistrate Judge

Plaintiff Maria Torres Cruz ("Plaintiff") suffers from a progressive disease – rheumatoid arthritis – that, if unchecked by early and aggressive treatment, can be expected to cause painful, permanent and potentially deforming changes to joints and other organs and systems. The matter before the Court is her motion for reversal of the decision of the Commissioner of Social Security (the "Commissioner"), denying Supplemental Security Income ("SSI") under §§ 205(g) and 1631(c)(3) of the Social Security Act, 42 U.S.C. §§ 405(g), 1383(c)(3) (the "Act"). Plaintiff contends that the decision of the administrative law judge ("ALJ") was infected by errors of law and not supported by substantial evidence; she now seeks to reverse the decision of the Commissioner. Defendant Michael J. Astrue ("Defendant") has filed a motion for an order affirming the Commissioner's decision.

These motions have been referred to me for preliminary review, findings and recommended disposition pursuant to 28 U.S.C. § 636(b)(1)(B). The Court finds that the ALJ's reliance on the opinions of two state agency physicians, Dr. Ronald Jolda and Dr. Erik Purins, was error because they were not based upon – and were significantly inconsistent with – the

substantial medical record developed after their assessments were done.  The Court further finds

that the ALJ's negative evaluation of Plaintiff's credibility was tainted by inappropriate

consideration of statements by her attorney not fairly attributable to Plaintiff, by unfounded

observations of the state agency physicians and by improper reliance on "secondary gain."

Accordingly, I recommend that Plaintiff's Motion to Reverse the Decision of the Commissioner

(ECF No. 16) be GRANTED and the Defendant's Motion for an Order Affirming the Decision

of the Commissioner (ECF No. 17) be DENIED.

## I.     <u>Background Facts</u>

Plaintiff was born in 1967.  Tr. 165.  She was forty-one as of the alleged onset date of her

disability on January 1, 2009, and forty-three as of the ALJ's decision.  <u>Id.</u>  She has a fifth grade

education that she received in Puerto Rico.  Tr. 225.  Her relevant diagnoses include severe

seropositive erosive rheumatoid arthritis, chronic anemia and hypothyroidism.  <u>Id.</u>  She has no

past relevant work experience, is illiterate and unable to communicate in English, barely literate

in Spanish and has no transferable skills.  Tr. 30.  For most of her adult life she was a

homemaker, living in Puerto Rico, performing wifely duties and raising six children.  Tr. 40, 43.

More recently, she divorced and moved to Worcester, Massachusetts, where she lives in a small

apartment with her sister-in-law and other family members, who assist her with the challenges of

daily living.  Tr. 46, 136.

For purposes of this appeal, Plaintiff's medical history began on May 4, 2009, when she

went to the emergency room at St. Vincent Hospital, Worcester Medical Center, complaining of

right side pain, numbness that had been getting worse and a history of swelling in the right knee

and ankle.  Tr. 258.  Her symptoms were described as mild, she walked with a normal gait

without assistance and maintained full range of motion in all extremities.  Tr. 258-60.  She was

prescribed Motrin and a muscle relaxant and discharged the same day.  Tr. 257-62.

Three days later, on May 8, 2009, she was interviewed in connection with her disability

application at the Social Security Field Office.  Tr. 173-82.  The interviewer made several

observations that were recorded on the form, including that:

> [Plaintiff] stood up slowly.  Had to move her entire body to get her wrist up high
> enough to rest it on the table to sign her name.  When walking away she limped a
> little on [the] right leg, but not much.  There was clearly a problem with her right
> arm/wrist.

Tr. 175.  In the portion of the form for recording additional information, the interviewer wrote:

> [Claimant] needs to be seen by some specialists if possible.  Having issues due to
> lack of health insurance.  No one will see her except for emergency room.
> Visually clear that [claimant] has problem with right arm and leg.  Right arm kind
> of just hangs there while she is sitting.  And right wrist is clearly swollen.

Tr. 182.

On July 30, 2009, Plaintiff began treating with her primary care physician, Dr. Sameh

Said, who immediately suspected rheumatoid arthritis.  Tr. 338.  This was her first "check-up"

since arriving in Massachusetts from Puerto Rico; in addition to joint problems, her test results

revealed anemia, hypercholesterolemia, hypothyroidism and B12 deficiency, all of which Dr.

Said began to address.  Tr. 337-38.  On examination, he observed effusion, swelling and pain

variously affecting the right knee, ankle, foot, elbow, wrist and shoulder and some effusion and

pain affecting the left side.  Tr. 338.  X-rays of her shoulders, elbows, and cervical spine revealed

degenerative joint disease at C6-C7 and loss of glenohumeral joint space.  Tr. 290-344.  Dr. Said

prescribed Prednisone, to which she had a good response; within two weeks, she reported that

her joints were moving better and the swelling, tenderness and hotness of her joints were much

improved.  Tr. 337.  He referred her to the UMass rheumatology clinic for follow-up.  Tr. 335-40.

At the rheumatology clinic, Plaintiff started treatment on September 21, 2009, with Dr. Karen Salomon-Escoto, who noted "worsening arthralgias over the past year involving mainly hands, wrists, and feet;" she diagnosed seropositive rheumatoid arthritis.  Tr. 320-22.  While Dr. Salomon-Escoto observed intact gait and that Plaintiff was able to get on and off the examining table without assistance, she also noted swelling, range of motion issues, ongoing synovitis and warmth in multiple joints.  Tr. 317-21, 473.  X-rays of Plaintiff's hands and feet showed degenerative and erosive changes "compatible with erosive osteoarthritis."  Tr. 301-02, 305-06, 307-10.  She had a very high disease activity score[1] of 6.73 and an HAQ[2] score of 2.38, indicating "much difficulty."  After treatment began, at a visit on November 16, 2009, her HAQ score had improved slightly from 2.38 to 2.25, and the synovitis and effusion had disappeared.  Tr. 317.  Nevertheless, Plaintiff reported difficulty with multiple activities of daily living, including dressing, hygiene, gripping, doing chores and opening things.  Tr. 317-18.  Dr.

---

[1] Disease activity score is an index used to measure disease activity in patients with rheumatoid arthritis, which has been validated in clinical trials.  It is based on a scale from zero to ten.  DAS-Score Website: Introduction, Radboud University Nijmegen Medical Centre, www.das-score.nl/das28/en/introduction-menu.html (last visited February 11, 2013).  The score is based on physician input and laboratory results; its reliability is considered excellent.  Jaclyn Anderson et al., "Rheumatoid Arthritis Disease Activity Measures: American College of Rheumatology Recommendations for Use in Clinical Practice," 64 Arthritis Care & Research, 640-47 (May 2012), http://www.rheumatology.org/practice/clinical/forms/RADAM-May%202012-AC&R.pdf#toolbar=1.  In using this index, the level of disease activity can be interpreted as low ($DAS \leq 2.4$), moderate ($2.4 < DAS \leq 3.7$) or high ($DAS > 3.7$).  "Rheumatoid arthritis measures," 49 Arthritis Care & Research, S214-24 (Oct. 15, 2003), http://onlinelibrary.wiley.com/doi/10.1002/art.11407/abstract.

[2] The HAQ score is based on a Health Assessment Questionnaire, which is a patient-reported outcome tool used to measure the impact of the disease on patient with rheumatoid arthritis.  B. Bruce, J.F. Fries, "The Stanford Health Assessment Questionnaire: Dimensions and Practical Applications," Health and Quality of Life Outcomes (June 9, 2003), available at http://www.hqlo.com/content/1/1/20.  The scoring is based on a four level response set from 0 to 3, where 0 = without difficulty; 1 = with some difficulty; 2 = with much difficulty and 3 = unable to do.  B. Bruce, J.F. Fries, "The Health Assessment Questionnaire (HAQ)," Clinical and Experimental Rheumatology (2005), http://www.clinexprheumatol.org/article.asp?a=2681; see also Tr. 146 (HAQ score between two and three indicates "very severe impairment;" HAQ score between one and two indicates "moderate to severe impairment").

Salomon-Escoto ordered more tests, prescribed increased doses of certain medications and added Enbrel by injection.  Tr. 318.

By her July 30, 2010, appointment with Dr. Salomon-Escoto, her arthritis was significantly improved.  Tr. 549-51.  Her gait was intact, she was able to get on and off the examination table without difficulty, her grip strength was adequate, she had good range of motion of her joints, her lower extremities moved well and there were no effusions, edema or synovitis.  Tr. 550.  Her motor strength was 5/5 for upper and lower extremities.  Id. Significantly, her HAQ score had improved significantly to 1.38; her disease activity score had dropped to 3.48.  Tr. 551.  The improvement was sustained through the December 22, 2010, appointment with Dr. Salomon-Escoto.  Tr. 547.  While Plaintiff complained of back pain at that appointment, her MRI was unrevealing.  Tr. 546.

On December 30, 2010, Plaintiff saw her primary care doctor, Dr. Said, again for a physical examination.  Tr. 366-67.  During the examination, Plaintiff told him that her arthritis was "under better control."  Tr. 366.  Dr. Said observed no edema, no neurological symptoms, no lymphadenopathy, no clubbing and no cyanosis.  Id.  He found her motor muscle strength and muscle tone were intact.  Id.  He noted some "joint deformity," but provided no opinion regarding how it affected Plaintiff's ability to function.  Id.  In addition to many other medications, he continued to prescribe Percocet as needed for pain.  Tr. 367.

On the same day, Dr. Said filled in a physical capacities evaluation form at Plaintiff's request in connection with this pending application.  Tr. 357-60.  It is noteworthy that this form was completed in the same time period as the appointment with Dr. Salomon-Escoto, where her significant improvement in response to treatment was noted, and on the same day that Dr. Said quoted Plaintiff as reporting that her arthritis was "under better control."  Tr. 366, 357-60, 366,

546-48.  Inconsistently, his evaluation described her prognosis as "poor;" it concluded "she is not able to work."  Tr. 357-59.  Although his examination had found her motor muscle strength and muscle tone intact with no edema, clubbing or cyanosis, on the form, his checkmarks on the form described her as incapable of performing virtually any functions at all.  Id.

## II.   **Travel of the Case**

Plaintiff's application for SSI was protectively filed in Massachusetts on April 30, 2009, alleging disability beginning on January 1, 2009, due to loss of motion in her right arm and leg, swelling of her joints and pain.  Tr. 18, 177.  As of the making of the application, she had not yet been diagnosed with, or treated for, rheumatoid arthritis.  The treatment of her symptoms by her primary physician, Dr. Said, did not begin until July 30, 2009, and she was not diagnosed until September 21, 2009.  Tr. 322, 361.

On July 16, 2009, a consultative examination of Plaintiff was performed by Dr. Ronald Jolda.  Tr. 263-75.  Because she had not yet started seeing either Dr. Said or Dr. Salomon-Escoto, he did not review any of their treatment records; because it had not yet been diagnosed, he was not aware that she had rheumatoid arthritis.  Rather, he performed a physical examination of Plaintiff and formed his opinions based on that examination, rather than on a review of the records.

Plaintiff told Dr. Jolda she had had swollen joints for two years and the condition had progressed; in Puerto Rico, she was told she needed to "come to USA to see a specialist about her problem."  Tr. 263.  On examination, she displayed normal ambulation and gait and did not appear to him to be in pain.  Tr. 264.  He found that she moved without difficulty, got on and off the examination table with ease, did not need an assistive device for walking and had normal range of motion in upper and lower extremities, except for somewhat reduced range of motion in

her shoulders and right elbow.  Tr. 264-66.  While he noted some mild background inflammation

in her knees and wrists, which he felt could be treated with non-steroidal, anti-inflammatory

medication, and mild muscle spasms in her cervical spine, he found that none of her joints were

swollen or inflamed.  Tr. 266.  Dr. Jolda ordered x-rays of her spine, elbows and shoulders[3] – he

found that all were normal except for some degenerative disc changes on her spine, and a

calcification affecting range of motion of one elbow.  Tr. 268-81.

Shortly after Dr. Jolda's examination, and with a still seriously underdeveloped record,

Dr. Erik Purins, a state agency physician, reviewed what little there was in the evidentiary record

(primarily Dr. Jolda's examination report) and completed a physical residual functional capacity

assessment on July 30, 2009.  Tr. 282-89.  He noted credibility issues as a result of the

discrepancy between Plaintiff's description of her symptoms and Dr. Jolda's findings and

observations.  Tr. 284.  He opined that Plaintiff could perform light work, involving occasional

pulling, pushing and overhead reaching; could occasionally climb ladders, ropes and scaffolds;

occasionally crawl and should avoid extreme temperatures and hazards.  Tr. 282-89.

Six months later, but four months after Plaintiff started treatment for rheumatoid arthritis

with Dr. Salomon-Escoto, on January 21, 2010, Dr. Romany Hakeem Girgis, another state

agency physician, completed a second physical residual functional capacity assessment based on

his review of the record, which was significantly developed from the record reviewed by Dr.

Purins.  Tr. 341-48.  In addition to confirmed rheumatoid arthritis, Dr. Girgis noted that Plaintiff

had gained a significant amount of weight in a short period of time and was taking multiple

medications; he considered obesity and the impact of her medications as factors in performing

---

[3] Dr. Jolda did not order x-rays of her hands or feet.  When those were ordered by Dr. Salomon-Escoto three months later, they showed degenerative and erosive changes "compatible with erosive arthritis."  Tr. 301-02, 305-06, 307-10.  Dr. Jolda's conclusions from the x-rays he ordered are also somewhat inconsistent with Dr. Said's report on x-rays of her shoulders, elbows and cervical spine, which revealed loss of glenohumeral joint space.  Tr. 290-344.

his assessment.  Tr. 343.  In a report that contrasts markedly with that done by Dr. Purins on a nearly empty record, he summarized the basis for his conclusions as follows:

> Rt. arm and rt. leg loss of motion.  Multiple joints swellings.  Pain prevents her from sleeping. walking, st[a]nding, sitting has been harder to do . . . Patient walks slowly with slight limp.  Cannot use her hands specially rt. wrist from pain and swellings.  She looks pale tired and easily fatigued.  On multiple medications.  The cumulative effects of obesity and sero positive erosive rheumatoid arthritis multiple joints on multiple meds plus her anemia and hypothyroidism a sedent[a]ry R.F.C. is reasonable for her medically determinable impairements [sic] . . . .  Patient is credible.  And her [activities of daily living] are severly [sic] compromised.

Tr. 342-43.  Based on these observations, Dr. Girgis concluded she was capable of sedentary work, with limitations on lifting and carrying more than ten pounds, reaching and handling, pushing and pulling with her upper and lower extremities and the working environment.  Tr. 341-48.

Plaintiff's application was denied initially and upon reconsideration.  Tr. 61-65.  She requested an administrative hearing, which request was granted on March 19, 2010.  Tr. 81-82.  At the hearing on February 8, 2011, Plaintiff, represented by counsel, and a vocational expert appeared and testified before ALJ Penny Loucas.  Tr. 37-60.  On March 30, 2011, the ALJ issued a written decision finding that Plaintiff was not disabled under the Act.  Tr. 15-36.  The Appeals Council denied Plaintiff's request for review on August 24, 2011.  Tr. 1-6.  Accordingly, the ALJ's decision became the final decision of the Commissioner and is now ripe for review under 42 U.S.C. § 405(g).  See 20 C.F.R. § 416.1481.  This appeal was initiated in the District of Massachusetts on October 6, 2011.  ECF No. 1.  After Plaintiff moved from Massachusetts to Providence, Rhode Island, pursuant to agreement of the parties, the case was transferred to this Court.  ECF No. 6, 7.

### III.   **The ALJ's Hearing and Decision**

At the administrative hearing, Plaintiff testified with the assistance of a translator.  She claimed to be in constant pain, particularly in her right arm and lower extremities, which was exacerbated when she walked any distance; in addition to many other medications, she testified to taking Percocet twice daily for pain.  Tr. 46, 49-50.  She said that her thyroid problem and the medications she was taking caused her to gain more than twenty-five pounds over a matter of months.  Tr. 47.  She claimed to be unable to sit comfortably for more than half-an-hour or to stand comfortably for more than an hour, and that she needed to shift positions every 2 hours. Tr. 50-51.  She said that she could only lift or carry three pounds or less and was unable to grasp or hold objects due to pain.  Tr. 53.  While she could brush her teeth, she required help with dressing and combing her hair; her sister-in-law helped to care for her.  Tr. 53-54.  Pain prevented her from sleeping more than one to two hours per night.  Tr. 53-54.  Although her physician had recommended walking, she got easily tired and her feet hurt; she testified that she used a walker as a result.  Tr. 51.

The walker resulted in a contretemps at the hearing, which morphed into a discrete paragraph in the ALJ's decision regarding the adverse impact of the walker on her credibility. Tr. 30.  At the hearing, Plaintiff's counsel represented that the walker had been recently prescribed by a Dr. Sullivan, emphasized this as evidence of the worsening of her condition and promised to supplement the record with his order.  Tr. 42 ("her symptoms have certainly gotten much worse since this point in time.  She's recently been prescribed a walker because she has difficulty ambulating"); Tr. 51 ("I believe it's Dr. Sullivan at UMass Memorial who is a doctor she's begun seeing.").  Post-hearing, the records arrived – they reveal that there is no Dr. Sullivan and no prescription or even suggestion by any provider that she use a walker.  Tr. 546-

98.  From the transcript of the hearing it is impossible to ascertain whether Plaintiff was hearing

a translation of these inaccurate statements by her counsel as they were made.  As translated by

the interpreter, Plaintiff's own testimony is entirely different – she never claimed that any

physician had ordered the walker.  Tr. 51.  She also was clear that the walker was her choice and

had not been prescribed by any doctor in one of the pre-hearing forms she completed.  Tr. 192.

After the hearing, the ALJ proceeded through the familiar five-step inquiry to determine

the merits of Plaintiff's claim.  After concluding that Plaintiff was not engaged in substantial

gainful activity at Step One, she proceeded to Step Two, finding that Plaintiff had the severe

impairment of rheumatoid arthritis within the meaning of 20 C.F.R. § 416.920(c).  Tr. 20.  She

noted the diagnoses of anemia, B12 deficiency and hypothyroidism and found that they were

treatable and therefore non-severe.  Tr. 21.  At Step Three, after consideration of Listing 14.09

(inflammatory arthritis), the ALJ determined that Plaintiff's impairments did not meet or

medically equal any of the listed impairments contained in 20 C.F.R. Part 404, Subpart P,

Appendix 1.  Tr. 21.

At Steps Four and Five, the ALJ found that Plaintiff's medically determinable

impairments could reasonably be expected to cause the alleged symptoms, but that her

statements concerning intensity, persistence and limiting effects of the symptoms were not

entirely credible because of the substantial disparity between her complaints and the objective

medical findings in the record.  Tr. 22.  While the ALJ found the pain symptoms legitimate, she

also found a pattern of inconsistency between Plaintiff's stated symptoms and the findings on

physical examination.  Tr. 24.  In addition to the credibility issues raised by the walker, the ALJ

placed considerable weight on the non-examining opinion of Dr. Purins, who commented

adversely on Plaintiff's credibility.  Tr. 26.  She wrote, "[b]ecause of these inconsistencies, secondary gain cannot be ignored."  Tr. 24.

The ALJ determined Plaintiff's residual functional capacity ("RFC")[4] at Step Four. Based principally on the examination report of consultative physician Dr. Jolda, to which she assigned great weight, and the RFC assessment by Dr. Purins, to which she assigned significant weight, the ALJ determined that Plaintiff retained the RFC to perform light work, as defined in 20 C.F.R. § 416.967(b), except that the essential functions of her job could be performed in either a seated or standing position.  Tr. 21, 25-26.  The ALJ further found that Plaintiff could perform postural functions occasionally, and that she could occasionally reach overhead with her dominant shoulder.  Tr. 21.  Lastly, the ALJ determined that Plaintiff should avoid concentrated exposure to hazards.  Id.  The ALJ concluded that her RFC determination was confirmed by the medical findings of treating physicians Dr. Salomon-Escoto and Dr. Said.  Tr. 26-30.  She accorded little weight to the physical capabilities evaluation form filled in by Dr. Said, because it was inconsistent with his own findings on examination.  Tr. 29.  She gave little weight to the RFC assessment prepared by non-examining state agency physician, Dr. Girgis, because it was inconsistent with the objective medical evidence, particularly the findings of Dr. Salomon-Escoto and Dr. Said from July through December 2010.  Tr. 28.

As Plaintiff did not have any past relevant work, the ALJ considered whether a person of her age, education, work experience and RFC could perform jobs that exist in significant numbers in the Massachusetts and national economies.  Tr. 31-32.  In reliance on the testimony of a vocational expert, the ALJ found that Plaintiff remained capable of performing other work

---

[4] Residual functional capacity is "the most you can still do despite your limitations," taking into account "[y]our impairment(s), and any related symptoms, such as pain, [that] may cause physical and mental limitations that affect what you can do in a work setting."  20 C.F.R. § 416.945(a)(1).

and, therefore, was not disabled within the meaning of the Act. <u>See</u> 42 U.S.C. § 1382c(a)(3)(A);

Tr. 31-32.

**IV.    <u>Issues Presented</u>**

Plaintiff argues that the Commissioner's decision that she is not disabled is not supported

by substantial evidence in the record and is infected by legal error for two reasons:

1. The ALJ erred in according "little weight" to the RFC assessments of state agency

    physician, Dr. Girgis, and treating physician, Dr. Said, as both are supported by

    and consistent with the objective medical evidence in the record.

2. The ALJ erred as a matter of law in devaluing Plaintiff's subjective complaints in

    that she failed to properly apply the factors set forth in SSR 96-7p and 20 C.F.R. §

    416.929.

**V.    <u>Standard of Review</u>**

The Commissioner's findings of fact are conclusive if supported by substantial evidence.

42 U.S.C. § 405(g).  Substantial evidence is more than a scintilla – that is, the evidence must do

more than merely create a suspicion of the existence of a fact, and must include such relevant

evidence as a reasonable person would accept as adequate to support the conclusion.  <u>Ortiz v.</u>

<u>Sec'y of Health & Human Servs.</u>, 955 F.2d 765, 769 (1st Cir. 1991) (per curiam); <u>Rodriguez v.</u>

<u>Sec'y of Health & Human Servs.</u>, 647 F.2d 218, 222 (1st Cir. 1981); <u>Brown v. Apfel</u>, 71 F.

Supp. 2d 28, 30 (D.R.I. 1999).  Once the Court concludes that the decision is supported by

substantial evidence, the Commissioner must be affirmed, even if the Court would have reached

a contrary result as finder of fact.  <u>Rodriguez Pagan v. Sec'y of Health & Human Servs.</u>, 819

F.2d 1, 3 (1st Cir. 1987); <u>see also</u> <u>Barnes v. Sullivan</u>, 932 F.2d 1356, 1358 (11th Cir. 1991);

<u>Lizotte v. Sec'y of Health & Human Servs.</u>, 654 F.2d 127, 128 (1st Cir. 1981).

The determination of substantiality is based upon an evaluation of the record as a whole. Brown, 71 F. Supp. 2d at 30; see also Frustaglia v. Sec'y of Health & Human Servs., 829 F.2d 192, 195 (1st Cir. 1987); Parker v. Bowen, 793 F.2d 1177, 1180 (11th Cir. 1986) (court also must consider evidence detracting from evidence on which Commissioner relied).  Thus, the Court's role in reviewing the Commissioner's decision is limited.  Brown, 71 F. Supp. 2d at 30. The Court does not reinterpret the evidence or otherwise substitute its own judgment for that of the Commissioner.  Id. at 30-31 (citing Colon v. Sec'y of Health & Human Servs., 877 F.2d 148, 153 (1st Cir. 1989)).  "[T]he resolution of conflicts in the evidence is for the Commissioner, not the courts."  Id. at 31 (citing Richardson v. Perales, 402 U.S. 389, 399 (1971)).  A claimant's complaints alone cannot provide a basis for entitlement when they are not supported by medical evidence.  See Avery v. Sec'y of Health & Human Servs., 797 F.2d 19, 20-21 (1st Cir. 1986); 20 C.F.R. § 416.929(a).

The Court must reverse the ALJ's decision on plenary review, if the ALJ applies incorrect law, or if the ALJ fails to provide the Court with sufficient reasoning to determine that the law was applied properly.  Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam); accord Cornelius v. Sullivan, 936 F.2d 1143, 1145-46 (11th Cir. 1991).  Remand is unnecessary where all of the essential evidence was before the Appeals Council when it denied review, and the evidence establishes without any doubt that the claimant was disabled.  Seavey v. Barnhart, 276 F.3d 1, 11 (1st Cir. 2001) (citing Mowery v. Heckler, 771 F.2d 966, 973 (6th Cir. 1985)).

The Court may remand a case to the Commissioner for a rehearing under Sentence Four of 42 U.S.C. § 405(g); under Sentence Six of 42 U.S.C. § 405(g); or under both sentences. Jackson v. Chater, 99 F.3d 1086, 1097-98 (11th Cir. 1996).

To remand under Sentence Four, the Court must either find that the Commissioner's decision is not supported by substantial evidence, or that the Commissioner incorrectly applied the law relevant to the disability claim.  Seavey, 276 F.3d at 9; accord Brenem v. Harris, 621 F.2d 688, 690 (5th Cir. 1980) (remand appropriate where record was insufficient to affirm, but also was insufficient for district court to find claimant disabled).  Where the Court cannot discern the basis for the Commissioner's decision, a Sentence Four remand may be appropriate to allow an explanation of the basis for the decision.  Freeman v. Barnhart, 274 F.3d 606, 609-10 (1st Cir. 2001).  On remand under Sentence Four, the ALJ should review the case on a complete record, including any new material evidence.  Diorio v. Heckler, 721 F.2d 726, 729 (11th Cir. 1983) (necessary for ALJ on remand to consider psychiatric report tendered to Appeals Council).  After a Sentence Four remand, the Court enters a final and appealable judgment immediately, and thus loses jurisdiction.  Freeman, 274 F.3d at 610.

In contrast, Sentence Six of 42 U.S.C. § 405(g) provides:

> The court ... may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding;

42 U.S.C. § 405(g).  To remand under Sentence Six, the claimant must establish: (1) that there is new, non-cumulative evidence; (2) that the evidence is material, relevant and probative so that there is a reasonable possibility that it would change the administrative result; and (3) there is good cause for failure to submit the evidence at the administrative level.  See Evangelista v. Sec'y of Health & Human Servs., 826 F.2d 136, 139-43 (1st Cir. 1987).  With a Sentence Six remand, the parties must return to the Court after remand to file modified findings of fact. Jackson, 99 F.3d at 1095 (citing Melkonyan v. Sullivan, 501 U.S. 89, 98 (1991)).  The Court

retains jurisdiction pending remand and does not enter a final judgment until after the completion of remand proceedings.  Id.

## VI.   <u>Disability Determination</u>

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. §§ 416(I), 423(d)(1); 20 C.F.R. § 416.905.  The impairment must be severe, making the claimant unable to do previous work, or any other substantial gainful activity which exists in the national economy.  42 U.S.C. § 423(d)(2); 20 C.F.R. § 416.905-911.

### A.   Treating Physicians

Substantial weight should be given to the opinion, diagnosis and medical evidence of a treating physician unless there are good reasons to do otherwise.  <u>See Rohrberg v. Apfel</u>, 26 F. Supp. 2d 303, 311 (D. Mass. 1998); 20 C.F.R. § 416.927(c).  If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight.  <u>Konuch v. Astrue</u>, No. 11-193L, 2012 WL 5032667, at *4-5 (D.R.I. Sept. 13, 2012); 20 C.F.R. § 416.927(c)(2).  The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory.  <u>See Keating v. Sec'y of Health & Human Servs.</u>, 848 F.2d 271, 275-76 (1st Cir. 1988).  The ALJ's decision must articulate the weight given, providing "good reasons" for the determination.  <u>See Sargent v. Astrue</u>, No. CA 11–220 ML, 2012 WL 5413132, at *7-8, 11-12 (D.R.I. Sept. 20, 2012) (where

ALJ failed to point to evidence to support weight accorded treating source opinion, court will not speculate and try to glean from the record; remand so that ALJ can explicitly set forth findings).

Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments. See Wheeler v. Heckler, 784 F.2d 1073, 1075 (11th Cir.1986). When a treating physician's opinion does not warrant controlling weight, the ALJ must nevertheless weigh the medical opinion based on the (1) length of the treatment relationship and the frequency of examination; (2) nature and extent of the treatment relationship; (3) medical evidence supporting the opinion; (4) consistency with the record as a whole; (5) specialization in the medical conditions at issue; and (6) other factors which tend to support or contradict the opinion. 20 C.F.R § 416.927(c). However, a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion. See 20 C.F.R. § 416.927(c)(2).

The ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled. However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability. 20 C.F.R. § 416.927(d). The ALJ is not required to give any special significance to the status of a physician as treating or non-treating in weighing an opinion on whether the claimant meets a listed impairment, a claimant's RFC (see 20 C.F.R. § 416.945-946), or the application of vocational factors because that ultimate determination is the province of the Commissioner. 20 C.F.R. § 416.927(d); see also Dudley v. Sec'y of Health & Human Servs., 816 F.2d 792, 794 (1st Cir. 1987) (per curiam).

### B.     Developing the Record

Social Security proceedings are "inquisitorial rather than adversarial."  <u>Sims v. Apfel</u>, 530 U.S. 103, 110-11 (2000); <u>Miranda v. Sec'y of Health, Educ. & Welfare</u>, 514 F.2d 996, 998 (1st Cir. 1975) (social security proceedings "are not strictly adversarial.").  The ALJ and the Appeals Council each have the duty to investigate the facts and develop the arguments both for and against granting benefits.  <u>Sims</u>, 530 U.S. at 110-11.  The obligation to fully and fairly develop the record exists if a claimant has waived the right to retained counsel, and even if the claimant is represented by counsel.  <u>Evangelista</u>, 826 F.2d at 142.  Courts in this Circuit have made few bones about the responsibility that the Commissioner bears for adequate development of the record.  <u>Id.</u>; <u>see</u> <u>Deblois v. Sec'y of Health & Human Servs.</u>, 686 F.2d 76, 80-81 (1st Cir. 1982); <u>Currier v. Sec'y of Health, Educ. & Welfare</u>, 612 F.2d 594, 598 (1st Cir. 1980).

### C.     Medical Tests and Examinations

The ALJ is required to order additional medical tests and examinations only when a claimant's medical sources do not give sufficient medical evidence about an impairment to determine whether the claimant is disabled.  20 C.F.R. § 416.917; <u>see also</u> <u>Conley v. Bowen</u>, 781 F.2d 143, 146 (8th Cir. 1986).  In fulfilling this duty to conduct a full and fair inquiry, the ALJ is not required to order a consultative examination unless the record establishes that such an examination is necessary to enable the ALJ to render an informed decision.  <u>Carrillo Marin v. Sec'y of Health & Human Servs.</u>, 758 F.2d 14, 17 (1st Cir. 1985).

### D.     The Five-Step Evaluation

The ALJ must follow five steps in evaluating a claim of disability.  <u>See</u> 20 C.F.R. § 416.920.  First, if a claimant is working at a substantial gainful activity, the claimant is not disabled.  20 C.F.R. § 416.920(b).  Second, if a claimant does not have any impairment or

combination of impairments that significantly limit physical or mental ability to do basic work activities, then the claimant does not have a severe impairment and is not disabled. Id. § 416.920(c). Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Appendix 1, the claimant is disabled. Id. § 416.920(d). Fourth, if a claimant's impairments do not prevent doing past relevant work, the claimant is not disabled. Id. § 416.920(e)-(f). Fifth, if a claimant's impairments (considering RFC, age, education and past work) prevent doing other work that exists in the local or national economy, a finding of disabled is warranted. Id. §§ 404.1520(g), 416.920(g). Significantly, the claimant bears the burden of proof at Steps One through Four, but the Commissioner bears the burden at Step Five. Wells v. Barnhart, 267 F. Supp. 2d 138, 144 (D. Mass. 2003) (five step process applies to both DIB and SSI claims).

In determining whether a claimant's physical and mental impairments are sufficiently severe, the ALJ must consider the combined effect of all of the claimant's impairments and must consider any medically severe combination of impairments throughout the disability determination process. 42 U.S.C. § 423(d)(2)(B). Accordingly, the ALJ must make specific and well-articulated findings as to the effect of a combination of impairments when determining whether an individual is disabled. Davis v. Shalala, 985 F.2d 528, 534 (11th Cir. 1993).

### E.    Capacity to Perform Work

The burden of proof is on the Commissioner to establish that the claimant could perform other work that exists in the local or national economy. Seavey, 276 F.3d at 5. To meet this burden, the ALJ must develop a full record regarding the vocational opportunities available to a claimant. Allen v. Sullivan, 880 F.2d 1200, 1201 (11th Cir. 1989). This burden may sometimes be met through reliance on the Medical-Vocational Guidelines (the "grids"). Seavey, 276 F.3d at

5.  Exclusive reliance on the grids is appropriate where the claimant suffers primarily from an exertional impairment, without significant non-exertional factors.  Id. (exclusive reliance on the grids is appropriate in cases involving only exertional impairments, impairments which place limits on an individual's ability to meet job strength requirements).  Exclusive reliance is not appropriate when a claimant is unable to perform a full range of work at a given RFC or when a claimant has a non-exertional impairment that significantly limits basic work skills.  Nguyen, 172 F.3d at 36.  In almost all of such cases, the Commissioner's burden can be met only through the use of a vocational expert.  Heggarty v. Sullivan, 947 F.2d 990, 996 (1st Cir. 1991).  It is only when the claimant can clearly do unlimited types of work at a given RFC that it is unnecessary to call a vocational expert to establish whether the claimant can perform work which exists in the national economy.  See Ferguson v. Schweiker, 641 F.2d 243, 248 (5th Cir. 1981).  In any event, the ALJ must make a specific finding as to whether the non-exertional limitations are severe enough to preclude a wide range of employment at the given RFC indicated by the exertional limitations.  Merola v. Astrue, C.A. No. 11-536A, 2012 WL 4482364, at *5 (D.R.I. Sept. 26, 2012).

### F.     Making Credibility Determinations

Where an ALJ decides not to credit a claimant's testimony, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding.  See Da Rosa v. Sec'y of Health & Human Servs., 803 F.2d 24, 26 (1st Cir. 1986); Rohrberg, 26 F. Supp. 2d at 309-10.  A reviewing court will not disturb a clearly articulated credibility finding with substantial supporting evidence in the record.  See Frustaglia, 829 F.2d at 195.

A lack of a sufficiently explicit credibility finding becomes a ground for remand when credibility is critical to the outcome of the case.  See Smallwood v. Schweiker, 681 F.2d 1349, 1352 (11th Cir. 1982).  If proof of disability is based on subjective evidence and a credibility determination is, therefore, critical to the decision, "the ALJ must either explicitly discredit such testimony or the implication must be so clear as to amount to a specific credibility finding." Foote v. Chater, 67 F.3d 1553, 1562 (11th Cir. 1995) (quoting Tieniber v. Heckler, 720 F.2d 1251, 1255 (11th Cir. 1983)).

**G.    Pain**

"Pain can constitute a significant non-exertional impairment." Nguyen, 172 F.3d at 36. Congress has determined that a claimant will not be considered disabled unless medical and other evidence (e.g., medical signs and laboratory findings) is furnished showing the existence of a medical impairment which could reasonably be expected to produce the pain or symptoms alleged.  42 U.S.C. § 423(d)(5)(A).  The ALJ must consider all of a claimant's statements about symptoms, including pain, and determine the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence.  20 C.F.R. § 416.928.  In determining whether the medical signs and laboratory findings show medical impairments which reasonably could be expected to produce the pain alleged, the ALJ must apply the First Circuit's six-part pain analysis and consider the following factors:

1. The nature, location, onset, duration, frequency, radiation, and intensity of any pain;

2. Precipitating and aggravating factors (e.g., movement, activity, environmental conditions);

3. Type, dosage, effectiveness, and adverse side-effects of any pain medication;

4. Treatment, other than medication, for relief of pain;

20

  5. Functional restrictions; and

  6. The claimant's daily activities.

Avery, 797 F.2d at 29; Gullon v. Astrue, No. 11-cv-099ML, 2011 WL 6748498, at *5-6 (D.R.I.

Nov. 30, 2011).  An individual's statement as to pain is not, by itself, conclusive of disability.  42

U.S.C. § 423(d)(5)(A).  Guidance in assessing the credibility of the claimant's statement is

provided by the Commissioner's 1996 ruling.  SSR 96-7p, 1996 WL 374186 (July 2, 1996).

Credibility of an individual's statement about pain or other symptoms and their functional effects

is the degree to which the statement can be believed and accepted as true; in making this

determination, the ALJ must consider the entire case record and may find that all, only some, or

none of an individual's allegations are credible.  Id. at *4.  One strong indication of the

credibility of an individual's statements is their consistency, both internally and with other

information in the record.  Id. at *5-6.

## VII.   Application and Analysis

### A.   ALJ's Evaluation of the Medical Opinions

  Plaintiff argues that the ALJ erred in giving little weight to the RFC assessments of Dr.

Said and Dr. Girgis, while affording great weight to the report by Dr. Jolda and Dr. Purins's RFC

assessment.  Some of Plaintiff's arrows fall wide of the mark, but others are on target.  Overall,

the ALJ's approach to the medical assessments left a hole that a remand will allow the

Commissioner to fill in.

  Diving deep, the Court first tackles the ALJ's primary source for her RFC determination

that Plaintiff is capable of light work: Dr. Jolda, to whom the ALJ assigned "great weight," is the

state agency physician who performed a physical examination of Plaintiff in July 2009.  His

examination was used by Dr. Purins, a non-examining state agency consultant, to develop the

RFC assessment that Plaintiff was capable of light work, with certain limitations.  This RFC was the basis for the hypothetical directed to the vocational expert who opined that Plaintiff could perform jobs that exist in the Massachusetts and national economies.

The problem with Dr. Jolda and Dr. Purins is that they performed their work at a time when Plaintiff had not started treating with Dr. Said, her primary care doctor; had not been diagnosed with rheumatoid arthritis; had not experienced the worsening of her condition as reflected in the records from September 2009 through March 2010; had not begun to take multiple toxic medications; and had not gained more than twenty-five pounds of weight as a result of her medications and other medical conditions.[5]  Her medical record at the time of their work was limited to the emergency room visit in May 2009, when her symptoms were found to be mild and she was given Motrin and a muscle relaxant and sent home.  In all, the record they never saw amounts to over three hundred pages.  The unreliability of Dr. Jolda's report is confirmed by his notes[6] that reflect that he considered whether there was any chance that Plaintiff might have a serious condition like rheumatoid arthritis, and mistakenly (as hindsight confirms) ruled it out.  Tr. 266.

---

[5] "The combined effects of obesity with other impairments may be greater than might be expected without obesity.  For example, someone with obesity and arthritis affecting a weight-bearing joint may have more pain and limitation than might be expected from the arthritis alone."  SSR 02-1p, 2000 WL628049, at *6.  The functional limitations caused by obesity in combination with arthritis may affect any of the exertional functions such as sitting, standing, walking, lifting, carrying, pushing, and pulling.  Id.

[6] Dr. Jolda wrote in his report that Plaintiff "has asymmetric joint problems so this rules out all the symmetric arthritis conditions."  Tr. 266.  Symmetrical arthritis refers to a group of diseases of the joints where one of the diagnostic indicators is the symmetry of the symptoms.  Rheumatoid arthritis is the most serious of these – as simplistically described in a lay resource, rheumatoid arthritis is a "disease that is symmetrical (appearing on both sides of the body) and can lead to severe deformity in a few years if not treated.  The symmetry of symptoms is a diagnostic feature used to determine the type of arthritis in a presenting patient. "Arthritis," Wikipedia, the free encyclopedia, http://en.wikipedia.org/wiki/Arthritis (last visited February 11, 2013).  That Dr. Jolda simply got it wrong is confirmed by treating physician Dr. Salomon-Escoto's near-contemporaneous note, where she observes that, as of September 2009, Plaintiff presented with "evidence of symmetric small joint polyarthritis, with a high titer rheumatoid factor."  Tr. 473.

Reliance on such a source as Drs. Jolda/Purins for the entire foundation of the finding of no disability is wrong as a matter of law.  Padilla v. Barnhart, 186 F. App'x 19, 22-23 (1st Cir. 2006) (error for ALJ to rely on consulting physicians who had incomplete medical record, with no medical expert at hearing); Gordils v. Sec'y of Health & Human Servs., 921 F.2d 327, 330 (1st Cir. 1990) (medical expert who had incomplete medical record counsels cannot be assigned controlling weight); Spielberg v. Astrue, No. 10-cv-463-PB, 2011 WL4971971, at *6-8 (D.N.H. Oct. 18, 2011) (error to rely on non-examining consultant's opinion based on medical records prior to fibromyalgia diagnosis); Eshelman v. Astrue, No. 06-cv-107-B-W, 2007 WL 2021909, at *3 (D. Me. July 11, 2007), aff'd, No. 06-cv-107-B-W, 2007 WL 2253420 (D. Me. July 31, 2007) (non-examining consultant's opinion is not substantial evidence of RFC when completed without material new evidence).  Such an error could readily have been cured if the ALJ had sought the assistance of a medical expert to review the entire record and testify at the hearing; however, she did not avail herself of that opportunity.  Giusti v. Astrue, CA 11-360ML, 2012 WL 4034512, at *10 (D.R.I. Aug. 22, 2012), aff'd, No. CA 11-360ML, 2012 WL 4036120 (D.R.I. Sept. 12, 2012) (ALJ's reliance upon consultants' assessments not error where medical expert reviewed the entire record); Vinal v. Astrue, No.1:10-cv-505-JAW, 2011 WL 4459273, at *2 n.4 (D. Me. Sept. 25, 2011), aff'd, No. 1:10-cv-505-JAW, 2011 WL 5191370 (D. Me. Nov. 1, 2011) (harmless error to use expert who did not see subsequent medical evidence, because medical expert at the hearing reviewed full record).  Under such circumstances, this Court is compelled to remand.  See O'Connor v. Astrue, CA 11-388 L, slip op. at 19-20 (D.R.I. Sept. 28, 2012) (Report & Recommendation of Martin, M.J. adopted in its entirety on 12/20/12) (remand for medical expert opinion to evaluate the significance of additional medical records, including claimant's weight gain).

While the work could end here, it is useful to the efficient travel of this matter to comment further on the problems with the other medical opinions about which the parties are sparring.

Next is the January 2010 assessment by Dr. Girgis – Dr. Girgis reviewed the record and prepared an RFC, which (unlike Drs. Jolda/Purins's RFC) took rheumatoid arthritis, Plaintiff's treating physicians' records as of the time of his review, obesity and multiple medications into account; he found her capable of sedentary work, with various limitations.  Tr. 341-48.  The Girgis mystery is why the ALJ and both parties misstated his opinion as concluding that Plaintiff was capable of "less than sedentary exertional work" and therefore compelling a finding of disability.  Tr. 27; ECF No. 16-1 at 7; ECF No. 17 at 5.  In fact, Dr. Girgis assessed her exertional limitations as able to sit for six hours and able to stand/walk for two hours; therefore, "a sedentary R.F.C. is reasonable for her medically determinable impairments."  Tr. 343.  With her age, minimal level of education, illiteracy in English, complete lack of work experience and the other limitations to which Dr. Girgis opined, Plaintiff plainly would not have been capable of the full range of sedentary work.  However, it is possible that Dr. Girgis's RFC, if presented in a hypothetical to a vocational consultant, would have resulted in the conclusion that Plaintiff is not disabled.  See 20 C.F.R. Pt. 404, Subpt. P, App. 2 (determining whether there is sedentary work that can be done by an individual under the age of 47, with no skills, and illiterate in English "requires an adjudicative assessment of factors such as the type and extent of the individual's limitations or restrictions and the extent of the erosion of the occupational base.").

The ALJ erroneously simply rejected Dr. Girgis as inconsistent with the more positive medical evidence from Dr. Salomon-Escoto and Dr. Said from the period beginning six months after his report, and after their aggressive treatment of the rheumatoid arthritis had begun to

work.  On this record, it is impossible to know whether his opinion compelled a finding of

disability or whether his opinion may be relied upon in light of Plaintiff's subsequent

improvement, mindful of the duration requirements of the Act.[7]  42 U.S.C. § 1382c(a)(3)(A).

With a disease like rheumatoid arthritis that can wax and wane, the duration requirement may

give rise to an exceedingly complex inquiry.  Barnhart v. Walton, 535 U.S. 212, 218-19 (2002)

(claimant must show both that impairment has lasted for twelve months and, ultimately that it is

severe enough to prevent him or her from engaging in substantial gainful activity for at least

twelve months); Sharp v. Barnhart, 152 F. App'x 503, 509 (6th Cir. 2005) (in evaluating an

episodic disease, consideration should be given to the frequency and duration of the disease's

exacerbations, the length of the remission and the evidence of any permanent disabilities);

Maddocks v. Astrue, No. 1:11-cv-461-NT, 2012 WL 5255197, at *4 (D. Me. Sept. 30, 2012)

(condition need not be "severe" or symptomatic day in and day out for twelve straight months to

meet the durational requirement); Kaufmann v. Sullivan, CIV. 91-241-S, 1992 WL 717818, at

*8-9 (D.N.H. Feb. 3, 1992) ("episodic illnesses can constitute disabilities under the Social

Security Act;" error to look at duration of episodic symptoms because twelve-month duration

requirement applies only to impairment, not to daily variation of claimant's symptoms).

　　　　The last claim of error in the ALJ's sifting of the medical opinions is her refusal to give

controlling weight to the assessment form completed by Plaintiff's treating physician, Dr. Said.

Here the ALJ got it right.  One way or the other, the check marks and brief responses Dr. Said

put on the physical capabilities questionnaire completed on December 30, 2010, are flawed.

Either they are inconsistent with his own examination of Plaintiff (performed on the same day)

and with Dr. Salomon-Escoto's conclusions from the prior week or they opine as to matters

---

[7] To qualify as a disability, an impairment must be expected to endure for twelve months.  42 U.S.C. § 1382c(a)(3)(A).

reserved to the Commissioner.  Therefore, they are appropriate to be disregarded.  See Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004) (a physician's checkmark opinion on a standardized multiple choice form is "not particularly informative"); Rosa v. Astrue, 708 F. Supp. 2d 941, 949-50 (E.D. Mo. 2010) (treating physician checkmarks are conclusory opinions that can be discounted if contradicted by other medical evidence).

Dr. Said's form describes a woman incapable of using her hands for more than 2% of the work day, never able to lift an object weighing five pounds or more, unable to sit for more than four hours or to stand or walk for more than one.[8]  Tr. 357.  This is inconsistent with his own treatment notes of the same day, where he found that "she feels that her arthritis is under better control . . . [n]o leg edema," "some joint deformity," but otherwise "[n]o edema, clubbing, or cyanosis," and "[m]otor muscle strength and muscle tone is intact."  Tr. 366; see also Costa v. Astrue, 565 F. Supp. 2d 265, 271 (D. Mass. 2008) (no error for ALJ to disregard disability opinion of treating physician inconsistent with his contemporaneous treatment notes); Quiles v. Barnhart, 338 F. Supp. 2d 363, 374-75 (D. Conn. 2004) (court baffled by inconsistencies between doctor's treatment notes and her RFC evaluation).  It is also inconsistent with Dr. Salomon-Escoto's notes from the prior week, in which she concluded that Plaintiff had 5/5 motor strength in her upper and lower extremities; she had an intact gait; she could get on and off of the examination table without any assistance; her grip strength was adequate bilaterally; she had good range of motion in the neck, shoulders, wrists, and elbows; and lower extremities moved well.  Tr. 454-56.  Although Dr. Said is a treating physician, his box-checked form may be rejected where it is contradicted by such competent medical evidence.  Arroyo v. Sec'y of Health

---

[8] At the hearing, Plaintiff's counsel used this RFC to ask the vocational expert a hypothetical.  Tr. 57-58.  Of course, it yielded the response that there would be no work.  Tr. 59.  In light of the problems with Dr. Said's assessment, this answer is as unhelpful as the response to the ALJ's hypothetical, which was based on Dr. Jolda, whose RFC assessment of Plaintiff is at the opposite pole from that of Dr. Said.

& Human Servs., 932 F.2d 82, 89 (1st Cir. 1991); accord Keating, 848 F.2d at 276 ("treating physician's conclusions regarding total disability may be rejected by the Secretary especially when, as here, contradictory medical advisor evidence appears in the record"); 20 C.F.R. § 416.927(d)(2).

The ALJ also properly rejected Dr. Said's conclusion that "Pt. is not able to work."  Tr. 359.  This opinion regards an issue reserved to the Commissioner and can never be afforded controlling weight. 20 C.F.R. § 416.927(e); Arroyo, 932 F.2d at 89 (finding ALJ not required to accept conclusions of claimant's treating physicians on ultimate issue of disability); Sitar v. Schweiker, 671 F.2d 19, 22 (1st Cir. 1982) (finding physician's conclusions with respect to the ultimate question of disability not binding on hearing examiner).

Because the ALJ properly discounted Dr. Said's RFC, she was also right to reject the vocational consultant's answer that "there would be no work" to the hypothetical posed by Plaintiff's attorney, which relied on Dr. Said's assessment.  Tr. 57-59.

To conclude, the ALJ used an RFC that was not based on substantial evidence, Plaintiff's counsel urged an RFC that was not based on substantial evidence, and the only RFC (Dr. Girgis) that might pass muster was not used by either the ALJ or Plaintiff's counsel to inquire of the vocational expert.  This matter must be remanded so that the ALJ to can procure a medical expert to review the entire record and assist the ALJ with her determination of Plaintiff's RFC, including the correct onset date.[9]  Blea v. Barnhart, 466 F.3d 903, 911-13 (10th Cir. 2006); Quarles v. Barnhart, 178 F.Supp.2d 1089, 1095-98 (N.D. Cal. 2001) (when record is ambiguous

---

[9] At the hearing, Plaintiff's counsel offered to amend the onset date from January 1, 2009, to as of when her treatment began in late July 2009.  If the ALJ had accepted that proffer, Dr. Jolda's examination would have fallen out of the alleged period of disability.  However, the ALJ made no response to the suggestion that onset was later than alleged in the application.  Tr. 43.  On remand, it may well be appropriate to amend the onset date as counsel suggested.

as to onset date of disability, ALJ must call a medical expert to assist in the determination).

During the hearing, the ALJ said to Plaintiff's counsel:

> I do recognize that rheumatoid arthritis can be, can be a disabling condition.  The extent of the question though is what effect does that condition have today on an individual, and whether or not those symptoms are likely to last 12 months or longer.

Tr. 42.  This is essentially the right question.[10]  On this record, it cannot be answered.  A remand is therefore necessary.

### B.       ALJ's Credibility Determination

The crux of the outcome of Plaintiff's claim was the negative credibility assessment made by both of the state agency physicians relied on by the ALJ and by the ALJ herself.  In critiquing the ALJ's credibility determination, this Court is mindful of the need to tread softly, because "[i]t is the responsibility of the [Commissioner] to determine issues of credibility and to draw inferences from the record evidence." Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991).  The ALJ's credibility determination, which is based upon her observation of the plaintiff, evaluation of demeanor, and consideration of how her testimony fits in with the rest of the evidence, is entitled to deference.  Frustaglia, 829 F.2d at 195. Nevertheless, when critical aspects of the ALJ's credibility determination are based on suppositions that do not constitute substantial evidence, remand is necessary.  Morin v. Sec'y of Health & Human Servs., 835 F.Supp. 1414, 1427 (D.N.H. 1992) (credibility finding not supported by substantial evidence cannot stand).

In her opinion, the ALJ erroneously highlighted three matters that she considered significant to credibility.  Tr. 22-30.  Cumulatively, they so taint the adverse credibility

---

[10] One caveat is that the duration requirement looks not at symptoms, but at the impairment itself.  42 U.S.C. § 423(d)(1)(A).

determination as to require that the matter be remanded so that the ALJ can consider Plaintiff's credibility without their improper influence.

First, the ALJ made much of several inconsistencies identified by state agency physician Dr. Purins between Plaintiff's symptoms and the "medical evidence." Tr. 25-26. However, the medical evidence that Dr. Purins was looking at consisted of the report by Dr. Jolda and the records from the May 2009 emergency room visit. Both of these sources seriously underestimated the severity of Plaintiff's condition in that neither understood that she had severe rheumatoid arthritis – the emergency room sent her away with Motrin and Dr. Jolda ruled out "symmetric arthritis" and concluded she could do light work. Because neither of these constitutes substantial evidence, Dr. Purins's "inconsistencies" are built of sand. It was error for the ALJ to make much of them. See Calhoun v. Astrue, 821 F. Supp. 2d 435, 440-41 (D. Mass. 2011) (error to reject credibility based on evidence of activity prior to onset of disabling impairment).

The ALJ's second focus for her credibility finding is Plaintiff's use of a walker at the hearing. Tr. 30. This incident, which exposed the supposedly chimerical quality of Plaintiff's complaints, occurred when the ALJ questioned Plaintiff because there was no indication in the record that any treating source had prescribed a walker. Tr. 51-52. In response, she testified that "[t]he doctor has recommended that I walk, so I walk with my walker."[11] Tr. 51. Her attorney jumped in, told the ALJ that it was prescribed by "Dr. Sullivan at UMass Memorial who is a doctor she's begun seeing," and promised to supply the relevant medical records; the attorney also referred to the recent prescription for the walker in arguing that Plaintiff's condition had recently gotten worse. Tr. 42-43, 51-52. The submitted records revealed that there is no Dr.

---

[11] Plaintiff never claimed that any physician had prescribed a walker. To the contrary, her answers on the Disability Request for Information form and at the hearing indicate that no doctor prescribed the walker and that she used it because her doctor told her to try to walk, which is difficult for her because of the condition of her feet. Tr. 51, 192.

Sullivan and no prescription for a walker.  Tr. 545-98; <u>see also</u> Tr. 264 (Dr. Jolda: no assistive device necessary for ambulation); 284 (Dr. Purins: alleged need of walker unsupported).

The walker potentially raises two very different credibility questions: first, whether Plaintiff was overreacting to a mild condition affecting her lower limbs by using a walker; and second – far more impactful on credibility – whether Plaintiff lied about the walker to cause the ALJ to believe that a physician had recently found her so impaired that she needs a walker. From the record, it would appear that the ALJ drew the latter, more insidious, conclusion based on the emphasis placed on the walker in the credibility discussion in the ALJ's opinion.  Tr. 30. There may be little doubt that such a lie would be a significant factor bearing adversely on credibility.  However, a careful review of the record reveals that it was not Plaintiff but her counsel who made the statements that the ALJ found to be so misleading.  Because Plaintiff is unable to speak or understand English, it is unlikely she understood any of this colloquy between her lawyer and the ALJ; certainly, there is no indication Plaintiff was aware of the extravagant and false arguments being made on her behalf.  It was error for the ALJ to ascribe this misleading conduct to Plaintiff in making the critical credibility determination.

The third credibility issue is the ALJ's reference to "secondary gain" as yet another factor bearing adversely on Plaintiff's credibility.  Tr. 24.  "Secondary gain" is a psychiatric term used when a patient has a hidden reason for holding an undesirable condition.  <u>Mazurek v. Massanari</u>, 40 F. App'x 681, 683 (3d Cir. 2002).  In the context of disability claims, it is used when a claimant lacks credibility based on the theory that he simply wants the money.  2 Soc.Sec. Disab. Claims Prac. & Proc. § 22:72 (2d ed.).  The concept must be used with care to avoid improper reliance on receipt of public assistance as a basis for discounting an applicant's credibility. <u>Bartley v. Astrue</u>, No. 07-89-B-W, 2008 WL 2704827, at *7 (D. Me. June 30, 2008) (claimant's

motivation cannot be questioned because she seeks to avail herself of public assistance); see also
Ramos v. Barnhart, 60 F. App'x 334, 336 (1st Cir. 2003) (improper for ALJ to rely on secondary
gain when no physician opined that claimant was magnifying or exaggerating complaints).

　　Unless a medical provider provides support for the conclusion that a claimant is
exaggerating his functional limitations based on secondary gain, reliance on the assumption that
the claimant is motivated by secondary gain is error.  See Simpson v. Astrue, No. 5:10-cv-72,
2011 WL 2458105, at *8 (D. Vt. June 16, 2011) (substantial medical evidence that disability
claim was motivated by secondary gain supported ALJ's credibility finding); Pires v. Astrue, 553
F. Supp. 2d 15, 24 (D. Mass. 2008) (where none of the physicians expressed skepticism
regarding claims of disability, difficult to determine reasonable basis for ALJ finding of lack of
credibility).  Here, Plaintiff's treating physicians made no adverse comment on her credibility –
indeed, agency consultant Dr. Girgis affirmatively observed that her complaints are credible.
Only non-examining agency physician Dr. Purins referred negatively to her credibility; however,
his pre-diagnosis opinion was not based on substantial evidence.  Because there is no competent
medical evidence in Plaintiff's record to justify an adverse credibility finding based on secondary
gain, to rely on it was error.  See Ramos, 60 F. App'x at 336.

　　These three grounds for discounting Plaintiff's credibility are not all that the ALJ pointed
to in her opinion.  However, it is plain that they tainted the ALJ's view of Plaintiff and colored
her view of other substantial evidence.  For example, based on her finding that Plaintiff totally
lacked credibility, the ALJ mentions her high HAQ scores but discounts them as based on
"claimant's self-report."  Tr. 27.  The HAQ scores so dismissed as unreliable were used, along
with other diagnostic tools, by treating physician Dr. Salomon-Escoto in deciding to prescribe an
increasingly toxic medley of medications including Enbrel by injection.  Tr. 462-64.  It is

illogical that Plaintiff would exaggerate her symptoms for such a consequence.  The ALJ also completely ignored Plaintiff's high disease activity scores, which are based on the physician's observations and laboratory results.

In short, the substantial evidence in the record does not support the ALJ's primary grounds for her adverse credibility finding and those errors appear to have seriously tainted the ALJ's evaluation of any evidence with a subjective component.  This matter must be remanded for a new credibility assessment untainted by improper considerations.

**VIII.   Conclusion**

On remand, the ALJ may well again conclude that Plaintiff is not credible and that she is not disabled within the meaning of the Act.  See Goulet v. Astrue, No. 3:06-cv-975-J-TEM, 2008 WL 681049, at *7 (M.D. Fla. Mar. 7, 2008).  Nevertheless, because the ALJ's RFC was based on the opinions of state agency physicians that were not supported by substantial evidence, and because the ALJ relied on an adverse credibility assessment that was not supported by substantial evidence, the matter must be remanded under Sentence Four of 42 U.S.C. § 405(g) for a determination of what is Plaintiff's RFC and whether there is work that Plaintiff can do. Accordingly, I recommend that Plaintiff's Motion to Reverse (ECF  No. 16) be GRANTED, and that Defendant's Motion to Affirm (ECF No. 17) be DENIED, and that final judgment enter in favor of Plaintiff.

Any objections to this Report and Recommendation must be specific and must be filed with the Clerk of Court within fourteen (14) days after the date of service.  See Fed. R. Civ. P. 72(b); DRI LR Cv 72(d).  Failure to file specific objections in a timely manner constitutes waiver of the right to review by the district court and of the right to appeal the district court's decision.

See United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986); Park Motor Mart, Inc. v.

Ford Motor Co., 616 F.2d 603, 605 (1st Cir. 1980).


/s/ Patricia A. Sullivan
PATRICIA A. SULLIVAN
United States Magistrate Judge
February 12, 2013